UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
BRIAN MACINEIRGHE, IAN
MACINEIRGHE, and TOMAS
MACINEIRGHE,

                                Plaintiffs,

        -against-

THE COUNTY OF SUFFOLK, SUFFOLK
COUNTY POLICE DEPARTMENT,
SUFFOLK COUNTY SHERIFF'S
DEPARTMENT, JONATHAN C. ALLEN,
JAMEL BOSWELL, PETER HANSEN,
CHRISTOPHER ANSKAT, CRAIG
KNUDSEN, NORTH SHORE LIJ,
SOUTHSIDE HOSPITAL, CESAR GREG
BENAVIDES and MAYOVEZ GONZALEZ,

                             Defendants.
----------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
13-cv-1512(ADS)(SIL)

**APPEARANCES:**

**KILGANNON & KILGANNON, LLP**
*Attorneys for the Plaintiffs*
1551 Kellum Place
Mineola, NY 11530
      By:   Timothy Kilgannon, Esq., Of Counsel

**OFFICE OF THE SUFFOLK COUNTY ATTORNEY**
*Attorneys for Defendants County of Suffolk, Suffolk County Police Department,
Suffolk County Sheriff's Department, Jonathan C. Allen, Jamel Boswell, Peter
Hansen, Christopher Anskat, and Craig Knudsen*
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, NY 11788
      By:   Jessica M. Spencer, Assistant County Attorney

**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
*Attorneys for Defendants North Shore Long Island Jewish Health System, Inc., Southside Hospital, Cesar Gregorio Benavides, and Mayovez Gonzalez*
150 East 42nd Street
New York, NY 10017
     By:   Aviva Stein, Esq.,
              Larry Lum, Esq., Of Counsel

**SPATT, District Judge:**

On March 21, 2013, the Plaintiffs Brian Macineirghe ("Brian"), Ian Macineirghe ("Ian"), and Tomas Macineirghe ("Tomas", collectively, the "Plaintiffs" or "Macineirghes") commenced this action against two groups of Defendants. The first group, referred to as the "County Defendants," includes the County of Suffolk (the "County"), the Suffolk County Police Department (the "SCPD"), the Suffolk County Sheriff's Department (the "SCSD"), and several individual Suffolk County police officers, namely, Defendants Allen, Boswell, Hansen, Gambino, Diffley, Bendetti, Anskat, and Knudsen.

The second group of Defendants, referred to herein as the "Hospital Defendants," includes North Shore Long Island Jewish Health System Inc. s/h/a North Shore LIJ ("NSLIJ"), Southside Hospital (the "Hospital"), Cesar Gregorio Benavides s/h/a Cesar Greg Benavides ("Benavides"), and Miguel Gonzalez s/h/a Mayovez Gonzalez ("Gonzalez").

The Complaint alleges violations of 42 U.S.C. §§ 1983 and 1985, the New York State Constitution, and various common law causes of action, all arising primarily from an altercation that took place on March 23, 2012 between the Plaintiff Brian Macineirghe and members of the SCPD.

On April 16 and 17, and July 30, 2013, all named Defendants interposed Answers to the Complaint and the action proceeded to discovery.

On July 9, 2014, the Hospital Defendants requested a pre-motion conference and, in accordance with Local Civil Rule 56.1 and this Court's Individual Rules, filed a statement of undisputed material facts, together with the Plaintiffs' responses.

On October 6, 2014, the action was voluntarily dismissed as against individual County Defendants Gambino, Diffley, and Bendetti.

On May 6, 2013, the Hospital Defendants filed the instant motion pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56, for an Order granting summary judgment dismissing all of the Plaintiffs' claims against them.

The Plaintiffs oppose the Hospital Defendants' motion. The County Defendants do not join in the motion or otherwise take a position with respect to the issues raised.

For the reasons set forth below, the motion is granted in part and denied in part.

## I.      Factual Background

Except as otherwise noted, the following facts are not in dispute and are construed in favor of the Plaintiffs.

### A.      The Parties

The Plaintiffs are individuals who, at all relevant times, resided in East Islip, New York. Brian and Ian are brothers; Tomas is their father.

The County Defendants consist of a municipality – Suffolk County – its police and sheriff's departments, and individual police officers employed by the County.

Defendant Southside Hospital is a private hospital located in Bay Shore, New York, and is a part of the larger NSLIJ Health System. At the time of the events giving rise to the Complaint, Benavides and Gonzalez were employed by Defendant **NS**LIJ as a nurse and security officer, respectively.

**B.    The Altercation Between Brian Macineirghe and the Police**

The events of March 23, 2012 begin at the Macineirghes's home, where an altercation between the Plaintiffs and certain individual police officer Defendants occurred. Although the facts surrounding the altercation are not in issue on the present motion, a brief recitation of the Plaintiffs' allegations, as to which the moving Defendants deny knowledge or information, is useful.

On March 23, 2012, Brian Macineirghe was allegedly waxing his car at the Plaintiffs' home at 27 Irish Lane in East Islip, New York (the "Premises"). At approximately 1:30 P.M., members of the SCPD, including Defendants Allen and Boswell, allegedly entered upon the Premises without a warrant and threatened, harassed, attacked, punched and kicked Brian for no reason.

The officers eventually handcuffed Brian, placed him under arrest, and drove him away in a squad car. Ian and Tomas allegedly asked the officers why Brian was being placed under arrest, but received no answer.

They later learned that Brian had been taken by the officers to Southside Hospital, where they also traveled. Tomas and Ian entered a yellow Ford Escape

SUV, along with Tomas's third son, Ross Macineirghe ("Ross"), and family friend Joseph Drago ("Drago"), and drove to the Hospital. Before leaving, Ian took his video camera.

It is at this point that the Hospital Defendants enter the incident.

## C. The Events at Southside Hospital

The following facts are drawn primarily from the parties' Rule 56.1 Statements and are, again, construed in the Plaintiffs' favor.

Tomas and Ian Macineirghe arrived at Southside Hospital and attempted to enter through the emergency room entrance, but were prevented from doing so by a security guard. Both Ian and Tomas testified that the security guard stated that Brian did not want to see them. See Tomas Dep. T. 46; Ian Dep. T. 82. At that point, the men traveled to the hospital's main entrance, where a receptionist provided them with visitor passes.

Ross and Drago remained in the car outside the Hospital during this time. There is no evidence that either of them entered the Hospital during the events that occurred that day.

Tomas and Ian then walked through the hospital to the emergency room area, where they saw Brian surrounded by a group of police officers. During this time, Ian carried his video camera, but had not begun filming.

Upon entering the emergency room area, Tomas exchanged words with the officers. The particular details of the exchange are unclear. Tomas claims he made a comment along the lines of, "it takes all you guys to guard a guy waxing his car?"

to which one of the officers stated, "[y]ou better get out of here or we'll arrest you." <u>See</u> Tomas Dep. T. 61-62. Ian recalls his father asking them "what was going on," to which Defendant Allen stated "[d]on't make things worse than it already is." <u>See</u> Ian Dep. T. 102.

In any event, at about this point, Ian began videotaping. With their opposition papers, the Plaintiffs provided the Court with a CD containing a two-minute video clip taken by Ian (the "Video").

The Video shows at least seven individuals, at least five of whom are in police uniforms, guarding Brian, who is seated behind a desk several feet high. When the camera focuses on Brian, a bleeding laceration over his right eye is clearly visible.

The parties do not materially dispute that, at some point, hospital personnel instructed Ian that videotaping is prohibited inside the Hospital. <u>E.g.</u> Benavides Dep. T. at 28. According to Defendant Benavides, Ian was videotaping patients in the emergency room, as well as doctors and nurses, which is prohibited by HIPAA laws.

In this regard, the Court notes that the Video does not appear to show any patients other than Brian, and while two individuals are shown in the Video not wearing police uniforms, it is not clear whether those individuals are doctors or nurses.

It is also undisputed that police and hospital personnel asked Tomas and Ian to leave the Hospital. In particular, Ian testified that a nurse and security guard, both of whom he was unable to identify, so instructed him. However, both

Defendant Benavides and Defendant Gonzalez deny directing Tomas and Ian to leave, and no such activity is clearly visible or audible on the Video.

Nevertheless, at some point during this exchange, Tomas instructed Ian to run away. Ian testified that he complied, but left the Hospital in a "brisk walk," not a run. See Ian Dep. T. 109. The Video demonstrates this fact — approximately twenty-seven seconds into the footage, it appears Ian hid the still-rolling camera underneath his clothes and quickly left the Hospital. This is consistent with Ian's testimony that upon being told not to videotape inside the Hospital, he placed it in his pocket, without being sure whether he had turned it off. See Ian Dep. T. 211. In the Video, Tomas can be heard yelling "run."

Regarding his motivation for telling Ian to run away during this exchange, Tomas testified: "After seeing what the police did to Brian, I said to myself, if they have some sort of change of heart, they are going to beat the crap out of [Ian] too." See Tomas Dep. T. at 72-73. Ian testified similarly: "I had the video camera, that's evidence. And I would prefer to keep that because that's important to me. I wouldn't want to be in the same position [as Brian] having a cut face or anything else injured on my body." See Ian Dep. T. 108.

Visible footage resumes approximately one minute and five seconds into the Video in the Hospital parking lot, where the next series of events took place. However, none of the ensuing relevant events were captured on film.

**D.      The Arrest of Tomas**

Tomas testified that after Ian left the Hospital in a run or brisk walk, he also left.  Defendant Boswell testified that he followed Tomas out of the Hospital and instructed him to "stop running," although he later clarified that Tomas was not running and actually was walking with a limp.  Defendant Benavides also recalled police officers instructing Tomas and Ian to stop running.  Boswell testified that his purpose in following Tomas was to interview him concerning his desire to remain at the Hospital after police and personnel had told him to leave.

When Tomas reached the parking lot, he looked around for the yellow Ford Escape SUV, which he believed Ian, Ross, and Drago occupied.  Eventually, he saw the vehicle and began waving to attract the men's attention, but, apparently, they failed to notice him.

As Tomas walked through the parking lot with Defendant Boswell behind, Defendant Knudsen's squad car was parked ahead of them.  Knudsen was inside the car, and was about to follow the yellow Ford Escape SUV, which Ian was believed to occupy.

Tomas claims not to have noticed any police around him as he walked through the parking lot.  Nevertheless, as he approached Knudsen's squad car, his "foot gave way" and he fell down.  <u>See</u> Tomas Dep. T. at 80.  Tomas testified that this happens to him regularly, although his testimony is unclear as to the reason it happens.  Ian also testified that he has witnessed this happen to his father in the past.

Boswell also testified that Tomas "just went down," but believes that Tomas deliberately fell down directly in the vicinity of Knudsen's squad car to prevent him from following Ian.  See Boswell Dep. T. at 88.  This is consistent with Knudsen's testimony, namely, that he got into his squad car with the intention of following the car that Ian occupied, and when he attempted to put the car in motion, he heard a "loud bang" or "thud" on the rear of the car that sounded like "someone hitting [or] slapping the side of the vehicle."  See Knudsen Dep. T. at 42-43.  When he stopped the vehicle, he saw Tomas on the ground yelling.

This is also consistent with Benavides's testimony that Tomas was "blocking" Knudsen's squad car from following the yellow Ford Escape SUV that contained Ian and that Tomas "threw himself on the ground."  See Benavides Dep. T. at 55.

As noted above, Tomas claims not to have observed any police around him as he walked through the parking lot, and claims that Knudsen's squad car simply appeared beside him after he fell.  He states that he stayed on the ground for only a second before lifting himself up.  Defendant Boswell disputes this, claiming that Tomas was on the ground for approximately 30 seconds.

Tomas also testified that when he got back on his feet, he stated to the officer operating the squad car, the Defendant Knudsen, that he was okay.  In particular, Tomas testified that he said, "I just fell down. Something like that.  I'm okay . . . Meaning, there was nothing going on.  I was fine."  See Tomas Dep. T. at 85-86.

Boswell disputes this, testifying that Tomas said "oh, he ran over my foot, my foot, my foot." See Boswell Dep. T. at 91. Knudsen also recalls Tomas yelling that his foot had been run over. See Knudsen Dep. T. at 45. However, when Boswell asked Tomas if he was okay, Tomas explained that he actually had a prior injury and that he "just kind of fell." He also stated that Knudsen had not driven over his foot. See id. Benavides recalled Tomas saying to Knudsen, "you hit me with your car." See Benavides Dep. T. at 58.

According to Tomas, Defendant Hansen then directed the officers to "arrest that man," referring to Tomas. See Tomas Dep. T. at 87. Boswell disputes this as well. Boswell testified that upon witnessing Tomas "throw [him]self in front of a police car when [its] trying to leave," he independently decided that Tomas had obstructed governmental administration. See Boswell Dep. T. at 94-95. According to Boswell, Defendant Hansen never instructed him to arrest Tomas.

Tomas was handcuffed in the Hospital parking lot and transported by Defendant Boswell to the police precinct. Tomas was detained and charged with obstructing governmental administration and criminal trespass. See Pl. R. 56.1 Stmt. ¶ 3. Attorney Jim Fallon posted Tomas's bail and he was released the same day.

### E.      The Arrest of Ian

Ian testified that he left the Hospital without his father and walked through the parking lot in order to find his brother, Ross. As he walked, he saw no one following him. Defendant Knudsen disputes this, claiming that he, Boswell, and

Hansen followed closely behind. Defendant Benavides, a Hospital employee, also disputes this, contending that when Ian ran out of the hospital, the police officers chased after him.

Eventually, Ian found Ross and Drago walking towards the Hospital and informed them that they "ha[d] to get out of there . . . because [he] had the video camera." See Ian Dep. T. 114-15. The three men then returned to the yellow Ford Escape SUV and began to drive away.

Defendant Knudsen testified that he observed Ian get into a vehicle, at which time he got into his own squad car with the intention of following and stopping the car in which Ian was traveling. Knudsen was prevented from immediately exiting the parking lot for this purpose because of Tomas's mysterious fall, as described above.

As Ian, Ross, and Drago were driving away from the Hospital, Defendant Knudsen located them and activated his emergency lights, directing them to pull over. Ian did not specifically identify the officer making the traffic stop as Knudsen, but that identification is now undisputed.

According to Ian's testimony, Knudsen instructed Ross to turn the car's motor off and then requested identification from all three men. Ian, Ross, and Drago complied, supplying the officer with identification, which he took back to the squad car.

While Knudsen was reviewing the men's identification, a second squad car arrived. Ian testified that the second officer, who is not clearly identified by the

parties, approached their car and instructed Ross to hand him the car keys. Ross complied and the officer threw the keys onto the hood of the car. The second officer then stood and watched the car; Ian believed this was to ensure that the men did not leave the vehicle.

The officers conferred for several minutes. Eventually, Knudsen approached the car door and removed Ian. Knudsen directed Ian to place his hands behind his back; handcuffed him; and then lowered him to a seated position on the side of the road. Ian testified that he asked whether he was being arrested and Knudsen responded "no, not yet." <u>See</u> Ian Dep. T. 130.

Knudsen then gave the car keys back to Ross, placed Ian in the squad car, and drove him to a police precinct. Ian was detained and charged with criminal trespass in the third degree. <u>See</u> Pl. R. 56.1 Stmt. ¶ 3. Drago posted Ian's bail and he was released the same day.

It is undisputed that all criminal charges were dismissed by the County as against all the Plaintiffs.

F.    **The Moving Defendants' Statements**

The principal basis for the Plaintiffs' claims against the Hospital Defendants is a series of statements that Defendants Benavides and Gonzalez made in the immediate aftermath of the events outlined above.

### 1. Defendant Miguel Gonzalez

Defendant Knudsen testified that, after he arrested Ian, Defendant Hansen, who is a Sergeant, and thus, a higher-ranking officer, directed him to obtain a witness statement from Gonzalez, a Hospital security officer.

Defendant Knudsen complied and secured two Burglary and Criminal Trespass Affidavits, which were signed by Gonzalez. The first, relating to Tomas, states, in relevant part, that:

> "On or about 1425 hrs [2:25 P.M.] 3/23/12, I was the owner, lawful custodian, or licensed to occupy a building . . . , namely Southside Hospital Town of Islip, County of Suffolk. I did not give Macineirghe, Tomas license or permission to enter or remain therein and no privilege existed for such entry or remaining.

See Pl. Summ. J. Mot., Ex. "11". An identical affidavit was created and signed by Gonzalez relating to Ian. See id. Ex. "12."

Defendant Knudsen testified that he prepared the statements after speaking with Gonzalez, and that Gonzalez confirmed the accuracy of the information contained in the statements before signing them. In particular, Knudsen testified that he confirmed that Gonzalez was present for the events involving Tomas and Ian inside Southside Hospital, and was, in fact, one of the individuals who had asked Tomas and Ian to leave the Hospital. Knudsen confirmed that the statements signed by Gonzalez were used in connection with Tomas's arrest by SCPD.

Knudsen's testimony in this regard is contradicted by Gonzalez's version of the events. Gonzalez testified that on the date in question, the usual Hospital

security supervisor called in sick and he was made temporary supervisor for the day.  He was scheduled to work the 4:00 P.M.-to-midnight shift, and did not arrive to work earlier than 4:00 P.M.

At some point, Gonzalez received a call from another security officer on his two-way radio requesting his assistance in responding to a disturbance in the emergency room.  However, when he arrived at the scene, Gonzalez did not observe any disturbance.  At his deposition he claimed not to recall any police officers being present in the emergency room when he arrived and denied having spoken to any.

With respect to the Burglary and Criminal Trespass Affidavits, Gonzalez admitted having signed them, but confirmed that he did not write them, and did not recall who did.  Gonzalez testified that he did not recall seeing Tomas or Ian on the date of the incident and did not speak to either of them.  As noted, Gonzalez maintains that he was at home and not at the Hospital at 2:25 P.M., the time indicated in the affidavits.  Also, he denied being a lawful custodian of Southside Hospital at that time.

Gonzalez testified that he had no understanding before, during, or after he signed the affidavits concerning the purpose for which they would be used.

### 2.    Cesar Gregorio Benavides

On March 23, 2012, Defendant Benavides, a Hospital nurse, provided Defendant Anskat, an individual police officer Defendant in this case, with a witness statement based on his observations of the relevant events.  He stated as follows:

I work in the emergency room at Southside Hospital as a registered nurse. I was working the 7 A.M. to 7:30 P.M. shift and at approximately 2:26 P.M. I saw two men arguing with police by the "BP" chair area. I noticed that the younger of the two individuals, the one wearing the orange shirt, was video taping [*sic*] the doctors, officers, and patients in the area. I told that person "Sir you can not [*sic*] record video in the hospital, please turn off the camera and delete the recording." He put the camera in his pocket and continued to argue with the officers. The older of the two individuals told him "Get out of here, run!" In an attempt to evade police and security the younger individual ran away and got into a yellow SUV in the parking lot. The older individual then blocked the police vehicle from attempting to chase the yellow SUV. I then saw the older man throw himself to the ground in an attempt to fake being struck by a police car. However, the police car never made contact with the older individual. I heard the older man say "I never said that the car hit my foot!" Video taping [*sic*] in the hospital is against HIPAA laws.

See Pl. Summ. J. Mot., Ex. "13".

Benavides testified that a police officer he could not identify wrote this statement outside of his presence, and he signed it. Benavides further testified that the portion of his statement relating to Ian attempting to evade the police was, in fact, his opinion.

The parties point to nothing in the record concerning the purpose, if any, for which Benavides's statement was used, or whether Benavides had any understanding as to its potential use.

## II.  Procedural History

Based on the events outlined above, the Plaintiffs commenced an action in this Court asserting claims against the County Defendants under 42 U.S.C. §§ 1983 and 1985, the New York State Constitution, and various common law causes of action.

In addition the Plaintiffs assert the following common law causes of action against the Hospital Defendants, which are relevant to the instant motion:  (i) libel and slander; (ii) negligence; (iii) conspiracy; and (iv) falsification of documents.  In addition, though not specifically pled as such, the Plaintiffs seek to impute vicarious liability to the Defendant NSLIJ for the allegedly tortious acts of its employees.

On October 6, 2014, the Hospital Defendants filed the instant motion seeking summary judgment dismissing all four of the Plaintiffs' claims against them.  In particular, the contentions are as follows:  (i) the Tenth Cause of Action for common law libel and slander should be dismissed because the statements at issue were either truthful or opinions, and thus not actionable as a matter of law; (ii) the Twelfth Cause of Action for common law negligence should be dismissed because the Hospital Defendants owed no duty of care to the Plaintiffs as a matter of law; (iii) the Thirteenth Cause of Action for common law civil conspiracy should be dismissed because New York does not recognize such a claim; and (iv) the Fourteenth Cause of Action for falsification of a document should be dismissed because no such cause of action exists at common law and the relevant New York and federal statutes do not apply under these circumstances.

The Plaintiffs oppose the motion in its entirety.

### III.    Discussion

**A.    The Legal Standards**

The standard for granting summary judgment under Fed. R. Civ. P. 56 is a familiar one.  The Court may appropriately grant summary judgment only when,

construing the evidence in the light most favorable to the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of fact exists when there is sufficient evidence on which a jury could reasonably find for the non-movant. <u>See Haskin v. United States</u>, 10-cv-5089, 2015 U.S. Dist. LEXIS 84762, at *19 (E.D.N.Y. June 30, 2015) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Put differently, no genuine issue of fact exists where the record, taken as a whole, could not lead a rational trier of fact to find for the non-movant. <u>See Figueroa v. Johnson</u>, 11-cv-2087, 2015 U.S. Dist. LEXIS 67371, at *10 (E.D.N.Y. May 22, 2015) (<u>Lovejoy-Wilson v. NOCO Motor Fuel, Inc.</u>, 263 F.3d 208, 212 (2d Cir. 2001)).

On a motion for summary judgment, the evidence of the non-movant is to be believed; all permissible inferences are to be drawn in his favor; and the Court must disregard all evidence favorable to the moving party that the jury is not required to believe. <u>See Redd v. N.Y. State Div. of Parole</u>, 678 F.3d 166, 174 (2d Cir. 2012) (quoting <u>Anderson</u>, 477 U.S. at 255; <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 151, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). " 'In sum, summary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict.' " <u>Id.</u> (quoting <u>Kaytor v. Electric Boat Corp.</u>, 609 F.3d 537, 546 (2d Cir. 2010)).

The moving party meets this burden by pointing to admissible evidence in the record, including depositions, documents, affidavits, or other materials, which demonstrate the absence of a genuine issue of material fact. See Figueroa, 2015 U.S. Dist. LEXIS 67371, at *10-*11 (citing Fed. R. Civ. P. 56(c)(1)(A), (2)). A fact is material if it might affect the outcome of the suit under the governing law. See Royal Crown Day Care LLC v. Dep't of Health & Mental Hygeine, 746 F.3d 538, 544 (2d Cir. 2014) (quoting Anderson, 477 U.S. at 248).

In this regard, "[t]he 'mere existence of a scintilla of evidence is not sufficient to defeat summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff.'" Haskin, 2015 U.S. Dist. LEXIS 84762, at *19 (quoting Anderson, 477 U.S. at 252). However, "[t]he role of the court is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Id. (quoting Redd, 678 F.3d at 173-74).

**B.**   **As to Whether Summary Judgment is Warranted on the Plaintiffs' Claim for Libel and Slander**

The Plaintiffs' common law defamation claim is premised upon three written statements: (i) Defendant Gonzalez's Burglary and Criminal Trespass Affidavit relating to Tomas; (ii) Gonzalez's Burglary and Criminal Trespass Affidavit relating to Ian; and (iii) Defendant Benavides's witness statement. See Pl. R. 56.1 Stmt. ¶ 5.

Initially, to the extent the Plaintiffs' defamation cause of action includes a claim for slander, that claim is denied as each of the implicated statements exists in written form. See Albert v. Loksen, 239 F.3d 256 (2d Cir. 2001) ("Generally, spoken defamatory words are slander; written defamatory words are libel"). Under New

York law, this is true even though the Defendants orally described their accounts to police before ultimately being reduced to writing. See Benedict v. Tarnow & Juvelier, LLP, 2013 NY Slip Op 33508(U), 2013 N.Y. Misc. LEXIS 6347, at *5-*6 (Sup. Ct. N.Y. Cty. 2013) (noting that where a defamatory statement is oral but is expected by the speaker to be reduced to writing and published, and is subsequently communicated in written form, such a statement constitutes a libel (quoting Park Knoll Assoc. v. Schmidt, 89 A.D.2d 164, 168, 454 N.Y.S.2d 901 (2d Dep't 1982), rev'd on other grounds, 59 N.Y.2d 205, 464 N.Y.S.2d 424 (1983))). Thus, the Plaintiffs' claim in this regard sounds in libel.

In determining whether summary judgment is appropriate as to the Plaintiffs' libel claim, the Court is guided by the following principles.

"To establish libel under New York law, a plaintiff must prove five elements: '(1) a written defamatory factual statement [of and] concerning the plaintiff; (2) publication to a third party; (3) fault [*i.e.,* negligence on the part of the speaker]; (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability.'" Sorvillo v. St. Francis Preparatory Sch., 14-cv-3417, 2015 U.S. App. LEXIS 6424, at *2-*3 (2d Cir. Apr. 20, 2015) (quoting Chau v. Lewis, 771 F.3d 118, 126-27 (2d Cir. 2014)); see Celle v. Filipino Reporter Enters., Inc., 209 F.3d 163, 176 (2d Cir. 2000) (same); Naples v. Stefanelli, 972 F. Supp. 2d 373, 400 (E.D.N.Y. 2013) (citing Boyd v. Nationwide Mut. Ins. Co., 208 F.3d 406, 409 (2d Cir. 2000) (same).

As to the first element, New York law defines "defamatory" as a statement that threatens to expose an individual to public hatred, shame, contempt, ridicule,

and deprives one of confidence and friendly intercourse in society. See Mitre Sports Int'l Ltd. v. HBO, Inc., 22 F. Supp. 3d 240, 252 (S.D.N.Y. 2014) (quoting Celle, 209 F.3d at 176). "Whether a particular statement is defamatory is a matter of law to be determined by the court in the first instance." Id. (quoting Celle, 209 F.3d at 177). In this regard, if the allegedly defamatory words are susceptible to multiple meanings, some of which are not defamatory, a fact issue is presented as to how those words are to be understood. See id. (citing Karedes v. Ackerly Grp., Inc., 423 F.3d 107, 113 (2d Cir. 2005)).

As to the second element, "[p]ublication occurs when the libelous words are read 'by someone other than the person libeled and the person making the charges.'" Van-Go Transp. Co. v. New York City Bd. of Educ., 971 F. Supp. 90, 102 (E.D.N.Y. 1997) (quoting Fedrizzi v. Washingtonville Cent. Sch. Dist., 204 A.D.2d 267, 268, 611 N.Y.S.2d 584 (2d Dep't 1994)); see Jain v. Sec. Indus. & Fin. Mkts. Ass'n, 08-cv-6463, 2009 U.S. Dist. LEXIS 91206, at *18 (S.D.N.Y. Sept. 28, 2009).

As to the third element, the Plaintiff's burden of proof varies depending on whether he is a public or private party. See DiBella v. Hopkins, 403 F.3d 102 (2d Cir. 2005), cert. denied, 546 U.S. 939, 126 S. Ct. 428, 163 L. Ed. 2d 326 (2005). As neither party contends that any of the Plaintiffs is a public figure, the appropriate level of fault to be proven is negligence. See Lawlor v. Gallagher Presidents' Report, Inc., 394 F. Supp. 721, 732 n.19 (S.D.N.Y. 1975) (collecting New York cases adopting a negligence standard where private plaintiffs, not involved in a public controversy, seeks to recover for publication of a defamatory falsehood about him); see also Pirre

v. Printing Developments, Inc., 468 F. Supp. 1028, 1040 n.12 (S.D.N.Y. 1979), aff'd, 614 F.2d 1290 (2d Cir. 1979).

As to the fourth element, "[t]ruth – even substantial truth – is, of course, the ultimate defense to defamation." Bloom v. Fox News, 528 F. Supp. 2d 69, 75 (E.D.N.Y. 2007) (collecting cases); see Guccione v. Hustler Magazine, Inc., 800 F.2d 298 (2d Cir. 1986) (noting that "truth is an absolute, unqualified defense to a civil defamation action" and statements that are even substantially true require dismissal as a matter of law "regardless of any impact the statement might have on [an individual]'s reputation" (internal citations omitted)).

That being said, under limited circumstances, technically true statements that have impliedly defamatory effects will not find shelter from a libel claim. Indeed, " '[d]efamation by implication is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements.' " Mitre Sports, 22 F. Supp. 3d at 253 (quoting Armstrong v. Simon & Schuster, Inc., 85 N.Y.2d 373, 380-81, 625 N.Y.S.2d 477 (1995); Krepps v. Reiner, 588 F. Supp. 2d 471, 483 (S.D.N.Y. 2008)). Defamation by implication "occurs where '[a] combination of individual statements which in themselves may not be defamatory might lead the reader to draw an inference that is damaging to the plaintiff.' " Sorvillo, 2015 U.S. App. LEXIS 6424, at *3-*4 (quoting Herbert v. Lando, 781 F.2d 298, 307 (2d Cir. 1986)). A plaintiff alleging defamation by implication typically has to show that the defendants intended such implication

when making the statement at issue.  See Ello v. Singh, 531 F. Supp. 2d 552, 580 (S.D.N.Y. 2007).

In addition, it is well-settled that expressions of pure opinion are not actionable under New York law.  See Celle, 209 F.3d at 178 (citing Flamm v. Am. Assoc. of Univ. Women, 201 F.3d 144, 147-48 (2d Cir. 2000)).  The standard for determining whether a statement is a protected opinion is whether, from the perspective of an ordinary reader, the words imply the existence of undisclosed facts justifying the opinion.  See id. (internal citations and quotation marks omitted)).  For example, an opinion is not protected if it implies "that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking."  Steinhilber v. Alphonse, 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901 (1986) (citing Rand v. New York Times Co., 75 A.D.2d 417, 422, 430 N.Y.S.2d 271 (1980)).  The Court must decide, as a matter of law, whether the challenged statements are opinion.  See Celle, 209 F.3d at 178 (citing Rinaldi v. Holt, Rinehart & Winston, 42 N.Y.2d 369, 381, 397 N.Y.S.2d 943 (1977)).

Finally, as to the fifth element, " '[s]pecial damages consist of the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation.' "  Thorsen v. Sons of Norway, 996 F. Supp. 2d 143, 164 (E.D.N.Y. 2014) (quoting Celle, 209 F.3d at 179).  Vague injuries such as "dignitary harm" or mere "injury to reputation" do not constitute special damages.  Id. at 165.

Here, to avoid confusion, the Court will consider the statements at issue separately, first examining the two Burglary and Criminal Trespass Affidavits by Gonzalez, as they are materially indistinguishable from one another, and then turning to the written witness statement given by Defendant Benavides.

### 1. As to Whether Summary Judgment is Appropriate Regarding the Burglary and Criminal Trespass Affidavits by Defendant Gonzalez

Gonzalez's affidavits contain the following factual assertions: (i) on March 23, 2012, at or about 2:25 P.M., he was the owner, lawful custodian, or licensed occupant of Southside Hospital; (ii) he did not give Tomas or Ian Macineirghe license or permission to enter or remain at the Hospital; and (iii) no privilege existed for their entry or remaining. With respect to these statements, the Hospital Defendants contend that the first and the fourth elements of a libel claim – namely, defamatory statement of and concerning the plaintiff, and falsity – have not been satisfied, requiring dismissal of the Plaintiffs' Tenth Cause of Action as against Gonzalez.

In this regard, the Hospital Defendants contend that Gonzalez's statements were not "defamatory" as a matter of law, because there is no record evidence suggesting that the Plaintiffs have been subjected to the kind of hatred, contempt, or ridicule that typifies a defamatory statement. In addition, the Hospital Defendants assert that each factual component of Gonzalez's statements is true, and thus the statements are not actionable as a matter of law.

The Court notes that the Hospital Defendants assert no argument in support of summary judgment relating to any of the other elements of the Plaintiffs' libel claim, namely, publication to a third party, fault, or special damages. To the extent the moving Defendants fail to address these remaining elements, the Court similarly need not address them.

For their part, the Plaintiffs maintain that Gonzalez's statements are defamatory inasmuch as they suggest Tomas and Ian engaged in criminal activity by illegally entering and remaining on Hospital property. Indeed, they assert that there is no evidence that Gonzalez's permission was required to lawfully enter the Hospital. For this reason, the Plaintiffs dispute the truthfulness of the statements and contend that, even if technically true, they are nevertheless impliedly defamatory and thus actionable.

Applying the standards outlined above, the Court concludes that genuine issues of material fact exist with respect to both the defamatory character and the truthfulness of Gonzalez's statements, and summary judgment as to this portion of the Plaintiffs' defamation claim is denied.

Initially, the Court concludes, as a matter of law, that Gonzalez's statements are susceptible to multiple meanings, some of which are defamatory, thereby presenting a jury question as to how they should be understood. See Celle, 209 F.3d at 178; Davis v. Ross, 754 F.2d 80, 82-83 (2d Cir. 1985) (holding that the determination as to whether the words in question are susceptible to only one or several meanings is for the Court to decide as a matter of law). Indeed, construed

in the light most favorable to the Plaintiffs, at least one possible reading of Gonzalez's statements imputes criminal activity to Tomas and Ian insofar as they unlawfully entered and remained in the Hospital without permission. Cf. Loder v. Nied, 89 A.D.3d 1197, 1200, 932 N.Y.S.2d 546 (3d Dep't 2011) (finding statements susceptible to a defamatory meaning insofar as they conveyed "at a minimum, serious impropriety and, at worst, criminal behavior"); Martin v. Daily News, L.P., 2009 NY Slip Op 31603(U), 2009 N.Y. Misc. LEXIS 3858, at *24 (Sup. Ct. N.Y. Cty. July 20, 2009) (noting that a jury question is presented where an imputation of criminal activity is susceptible of more than one meaning).

Such a reading is objectively reasonable in light of Defendant Knudsen's testimony that, at the behest of his ranking officer, he returned to the Hospital after arresting Ian to collect a witness statement from Gonzalez that would later support charges against Tomas. This conclusion is further buttressed by Knudsen's testimony that, in the course of soliciting Gonzalez's statements, he attempted to confirm that Gonzalez was present for the events giving rise to the arrests of Tomas and Ian, and that Gonzalez had, in fact, asked the men to leave the Hospital. Whether this defamatory construction, among others, is the intended meaning of Gonzalez's statements, is a matter for a jury to decide.

Furthermore, the Court finds genuine issues of material fact regarding the truthfulness of Gonzalez's statements. Despite indicating in the Burglary and Criminal Trespass Affidavits that, on March 23, 2012 at 2:25 P.M. he was the owner,

lawful custodian, or licensed occupant of the Hospital, he testified inconsistently

with that position during his deposition. In particular, Gonzalez testified as follows:

> Q: On March 23, 2012 at about 2:25, as a supervisor, was it your
> understanding that you were a lawful custodian of Southside Hospital
> at that date and time?
> A: Not at the time, no.
> Q: But as a supervisor of security at Southside Hospital, is it your
> understanding that you're a lawful custodian at that location?
> A: Yes.

<u>See</u> Gonzalez Dep. T. at 43-44. Gonzalez's self-contradictory statements in this

regard are sufficient to permit a rational juror to find for the Plaintiffs on the issue

of truthfulness.

In this regard, Gonzalez's representation that he was the lawful custodian on

the date and time in question is material. In fact, it is the linchpin of the entire

statement because, without it, the other factual assertions contained therein are

temporally unbounded and bear no direct relevance to the criminal trespass charges

the statement was meant to support.

Viewing the statement as a whole, and in the light most favorable to the

Plaintiffs, Gonzalez's statement conveys that, at the time of the particular

complained-of events, he was the lawful custodian of the Hospital and, despite not

granting Tomas and Ian permission to enter Hospital property, they unlawfully did

so. <u>See</u> <u>Davis</u>, 754 F.2d at 83 (identifying relevant analytical factors, including: (i)

considering the publication "as a whole," with a view toward its "whole apparent

scope and intent," and "not picking out and isolat[ing] particular phrases"; and (ii)

reading the statement "against the background of its issuance with respect to the

circumstances of its publication" (internal citations and quotation marks omitted)). Thus, a jury question exists as to whether, from the perspective of an ordinary and average reader, Gonzalez's statements are false and potentially defamatory. Cf. id., 754 F.2d at 82-83 (applying an "ordinary and average reader" standard to determine whether a statement was defamatory).

The Court finds issues of fact regarding the defamatory character and truthfulness of Gonzalez's statements. Therefore, it need not reach the Plaintiffs' argument relating to the doctrine of defamation by implication.

Accordingly, the Hospital Defendants' motion for summary judgment, to the extent it seeks to dismiss the Plaintiffs' Tenth Cause of Action as against Gonzalez, is denied.

## 2. As to Whether Summary Judgment is Appropriate Regarding the Written Witness Statement Given by Defendant Benavides

The Hospital Defendants also contend that summary judgment is appropriate as to the Plaintiffs' libel claim as against Defendant Benavides because: (i) his written witness statement is truthful and therefore not actionable; and similarly, (ii) any allegedly defamatory words contained in his statement constitute pure opinion and are also not actionable. The Court agrees.

Benavides's statement contains the following factual assertions: (i) he was working at the Hospital on the date and time in question; (ii) at approximately 2:26 P.M. he observed two men (Tomas and Ian) arguing with police inside the Hospital; (iii) Ian was videotaping inside the Hospital in violation of HIPAA laws; (iv) he instructed Ian to turn off the video camera and delete the recording; (v) at

some point, Tomas instructed Ian to run; (vi) in an effort to evade the police and Hospital security, Ian ran away and into a yellow SUV; (vii) Tomas then blocked a police car from following Ian; and (viii) Tomas threw himself onto the ground, claiming to have been struck by a police car.

In this regard, Benavides testified that these assertions accurately reflect what he observed, and that he carefully reviewed the statement prior to signing it, even making a correction to reflect that Ian had been wearing an orange shirt and not a yellow one, as the officer who initially wrote out the statement erroneously stated.

The Plaintiffs fail to materially dispute the truthfulness of Benavides's statement. In fact, in their counterstatement pursuant to Local Civil Rule 56.1, the Plaintiffs state only that: (i) Benavides did not instruct Ian to delete the video recording; and (ii) Benavides did not see Ian get into a yellow SUV. However, it is undisputed that Ian was instructed to stop videotaping inside the Hospital and that he did, in fact, leave in a yellow SUV. Thus, the Plaintiffs attempt to defeat summary judgment only by calling into question whether or not Benavides instructed Ian to delete the recording. The Court finds that particular fact immaterial as a matter of law because its truth or falsity has no appreciable effect on the outcome of the case. Accordingly, the Plaintiffs' argument in this regard is insufficient to raise an issue of fact where none otherwise exists.

Moreover, Benavides testified unequivocally that the portion of his statement relating to the men's effort to evade the police and Hospital security constituted his

opinion, which was based on his observation of Ian running away from the police. Although it appears he was not similarly questioned about his statement that Tomas "blocked" Knudsen's squad car from following Ian, the Hospital Defendants nevertheless contend that it, too, is a protected, non-actionable opinion.

The Plaintiffs do not meaningfully address this contention in their opposition papers, instead attempting to point out factual discrepancies between Benavides's alleged opinions and other evidence in the record.

In this regard, the Court finds, as a matter of law, that the following statements by Benavides constitute pure opinion: (i) Ian's act of running out of the Hospital was an attempt to evade the police and Hospital security; and (ii) Tomas's act of falling to the ground in the vicinity of Knudsen's squad car was an attempt to "block" the car from pursuing Ian. Indeed, there can be no question that an ordinary reader would not reasonably understand Benavides's words to imply undisclosed facts justifying the opinions. On the contrary, Benavides clearly supplies the factual predicate for his opinions, which is based on his personal knowledge, the truthfulness of which the Plaintiffs do not materially dispute.

In particular, Benavides's opinion that Ian was attempting to evade police is premised on his observations of Ian videotaping in violation of HIPAA laws; police and Hospital personnel directing him to stop doing so; his father directing him to run away; and Ian's compliance with that directive, fleeing on foot into a vehicle, despite police chasing after him and instructing him to stop running. These facts, which the Plaintiffs do not dispute, inarguably support Benavides' opinion.

Similarly, Benavides's opinion that Tomas was attempting to "block" Knudsen's squad car from pursuing Ian's vehicle is premised on his observations of Ian running out of the Hospital away from the police officers; Ian getting into a vehicle; police officers indicating that they "were going to chase" Ian, see Benavides Dep. T. 48; Knudsen getting into his squad car; Tomas falling to the ground in the vicinity of Knudsen's squad car before he could put it in motion; and Tomas's conflicting remarks, initially claiming to have been struck by Knudsen's car, and subsequently claiming that he had a pre-existing injury.

The only one of these facts arguably disputed by the Plaintiffs concerns where exactly in the vicinity of Knudsen's squad car did Tomas fall? The Plaintiffs contend that a question of fact exists because Benavides describes Tomas falling "in front of" Knudsen's car, while Knudsen states that he heard a "loud bang" near the middle or rear of the passenger side. See Pl. Memo in Opp. at 11-12. Even viewing this inconsistency in the light most favorable to the Plaintiffs, it is insufficient to defeat summary judgment. Indeed, regardless of whether Tomas fell in front of, to the side of, or behind Knudsen's car, the Plaintiffs do not dispute that his fall prevented Knudsen from placing the car in motion in order to pursue Ian. Under these circumstances, Benavides had ample facts available to him to reasonably form the opinion that Tomas was acting to "block" Knudsen's squad car.

Accordingly, the Hospital Defendants' motion for summary judgment, to the extent it seeks it seeks to dismiss the Plaintiffs' Tenth Cause of Action as against Benavides based on libel, is granted.

## C.    As to Whether Summary Judgment is Warranted on the Plaintiffs' Claim Based on Negligence

The Hospital Defendants contend that summary judgment is warranted as to the Plaintiffs' negligence cause of action because no relationship existed between the parties that would give rise to a legal duty of care.  The Hospital Defendants rely on the facts that Tomas and Ian were "visitors" at the Hospital and "had no communications" with Gonzalez or Benavides.  <u>See</u> Movants Memo of Law at 17-18.

The Court need not reach this argument because it finds the Plaintiffs' negligence claim impermissibly duplicative of their defamation claim, warranting dismissal as a matter of law.

In this regard, the basis of the Plaintiffs' negligence claim against Gonzalez and Benavides is that they acted negligently in making their statements to the police.  In particular, the Plaintiffs claim that a reasonably prudent person under the circumstances would not have made such statements because their contents are either contradicted by other facts in the record or altogether untrue.

However, this is the same basis for the Plaintiffs' defamation claim.  Indeed, an essential element of libel also requires them to establish that Gonzalez's and Benavides's statements were negligently made.  <u>See</u> <u>Lawlor</u>, 394 F. Supp. at 732 n.19 (S.D.N.Y. 1975) (noting that New York courts apply a negligence standard to defamation claims by private plaintiffs).

In addition, the Court notes that the Plaintiffs completely fail to address the Hospital Defendants' contention that no duty of care existed between the parties. Therefore, the Court finds the Plaintiffs' negligence claim is duplicative of and

subsumed within their defamation claim. See Pusey v. Bank of Am., N.A., 14-cv-4979, 2015 U.S. 91083, at *9 (E.D.N.Y. July 14, 2015) (dismissing a negligence claim as duplicative of a defamation claim; noting that "New York courts have 'kept a watchful eye for claims sounding in defamation that have been disguised as other causes of action'" (quoting Lesesne v. Brimecome, 918 F. Supp. 2d 221, 224 (S.D.N.Y. 2013))); Lucking v. Maier, 03-cv-1401, 2003 U.S. Dist. LEXIS 23060, at *21 (S.D.N.Y. Dec. 23, 2003) (dismissing the plaintiff's negligence claim on the grounds that it could "only be understood as duplicative of or subsumed by plaintiff's claim for defamation" because, as here, "an element of a defamation or libel claim is fault . . . on the part of the defendants"); see also Trachtenberg v. FailedMessiah.com, 43 F. Supp. 3d 198 (E.D.N.Y. 2014) (dismissing a negligence claim under Fed. R. Civ. P. 12(b)(6), explaining that the "plaintiff's failure to plead that defendant owed a duty to plaintiff and that defendant breached that duty strongly suggests that plaintiff's negligence claim is duplicative of her defamation claim. . . . [T]he conduct plaintiff alleges – that defendant published a false article about her – falls well within the tort of defamation; therefore, defamation, and not negligence, is where plaintiff's claim appropriately lies") (citing Sweeney v. Prisoners' Legal Servs. of New York, Inc., 146 A.D.2d 1, 7, 538 N.Y.S.2d 370 (3d Dep't 1989)); cf. Chao v. Mount Sinai Hosp., 10-cv-2869, 2010 U.S. Dist. LEXIS 133686, at *33-*34 (S.D.N.Y. Dec. 17, 2010) ("Where tort claims essentially restate a defamation claim that has been dismissed on a motion to dismiss, the tort claims

must also be dismissed" (citing O'Brien v. Alexander, 898 F. Supp. 162, 172 (S.D.N.Y. 1995))).

Further, it is within the Court's discretion to dismiss duplicative claims *sua sponte*. E.g., Safka Holdings LLC v. iPlay, Inc., 42 F. Supp. 3d 488, 492 (S.D.N.Y. 2013); Sorrell v. Inc. Vill. of Lynbrook, 10-cv-49, 2012 U.S. Dist. LEXIS 77303, at*14 n.4 (E.D.N.Y. June 4, 2012).

Accordingly, the Hospital Defendants' motion for summary judgment, to the extent it seeks it seeks to dismiss the Plaintiffs' Twelfth Cause of Action based on negligence, is granted.

## D. As to Whether Summary Judgment is Warranted on the Plaintiffs' Claims Based on Conspiracy and Falsification of Documents

The Hospital Defendants contend that summary judgment is warranted as to the Plaintiffs' Thirteenth Cause of Action for common law civil conspiracy. In particular, the Hospital Defendants contend that New York law does not recognize a stand-alone cause of action for civil conspiracy and there is no evidence to demonstrate that the Hospital Defendants corruptly agreed to commit any of the other torts alleged against them, namely, defamation, negligence, and falsification of documents.

The Hospital Defendants further contend that summary judgment is also warranted as to the Plaintiffs' Fourteenth Cause of Action for common law falsification of documents. In particular, they claim that New York common law does not recognize such a claim; rather, any cause of action for falsifying documents arises under statute and only provides a remedy in instances where the false

documents seek to claim monetary payment from the government. <u>See, e.g.</u>, N.Y. State Fin. L. § 188(1) (defining a "claim" for purposes of New York's False Claims Act as a "request or demand . . . for money or property").

The Plaintiffs' opposition papers fail to address either of these aspects of the Hospital Defendants' summary judgment motion. Thus, the Hospital Defendants contend in their reply papers that both claims should be deemed unopposed and summarily dismissed.

"This Court agrees that Plaintiffs' failure to acknowledge, let alone address, the [civil conspiracy and falsification of document claims] in opposition to the [m]otion signals the abandonment of these claims." <u>Avola v. Louisiana-Pacific Corp.</u>, 991 F. Supp. 2d 381, 390 (E.D.N.Y. 2013) (granting summary judgment on five claims not directly opposed in the plaintiff's opposition papers) (citing <u>Struthers v. City of N.Y.</u>, 12-cv-242, 2013 U.S. Dist. LEXIS 76916, at *62-*63 (E.D.N.Y. May 31, 2013); <u>Robinson v. Roosevelt Union Free Sch. Dist.</u>, 10-cv-834, 2012 U.S. Dist. LEXIS 76524, at *18 (E.D.N.Y. May 31, 2012); <u>Santiago v. City of N.Y.</u>, 05-CV-3668, 2009 U.S. Dist. LEXIS 30371, at *37-*38 n.20 (E.D.N.Y. Mar. 31, 2009); <u>Williams v. British Airways, PLC</u>, 04-cv-471, 06-cv-5085, 2007 U.S. Dist. LEXIS 73997, at *47-*48 (E.D.N.Y. Sept. 27, 2007); <u>Ostroski v. Town of Southold</u>, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006); <u>DeVito v. Barrant</u>, 03-cv-1927, 2005 U.S. Dist. LEXIS 22444, at *33 (E.D.N.Y. Aug. 23, 2005); <u>Taylor v. City of N.Y.</u>, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment

fails to address the argument in any way"); see also Lelin v. Bank of Am., N.A., 13-cv-6430, 2015 U.S. Dist. LEXIS 65900, at *3 (E.D.N.Y. May 20, 2015); Rinaldi v. Quality King Distribs., 29 F. Supp. 3d 218, 230 (E.D.N.Y. 2014); Blake v. Rice, 487 F. Supp. 2d 187, 218 (E.D.N.Y. 2007) (citing de Dussuau v. Blockbuster, Inc., 03-cv-6614, 2006 U.S. Dist. LEXIS 7368, at *24 (S.D.N.Y. Mar. 7, 2006)).

Accordingly, the Court deems the Plaintiffs' Thirteenth and Fourteenth Causes of Action, based on conspiracy and falsification of documents, respectively, abandoned and grants the Hospital Defendants' motion for summary judgment dismissing those claims.

**E.    As to Whether Summary Judgment is Warranted as to NSLIJ and Southside Hospital**

Finally, the Hospital Defendants contend, and the Plaintiffs do not dispute, that each of the claims asserted against the Hospital Defendants relates solely to Gonzalez and Benavides, individually, and thus summary judgment is appropriate as to Defendants NSLIJ and Southside Hospital.

The Plaintiffs contend, however, because the complained-of conduct by Gonzalez and Benavides occurred while they were employed by Defendant NSLIJ, and within the scope of their employment, that Defendant NSLIJ is vicariously liable for their torts.

Initially, it warrants noting that the Plaintiffs appear to concede that Gonzalez and Benavides were employed by Defendant NSLIJ and not Southside Hospital.  In light of this concession, and because the Plaintiffs do not assert any

other cognizable claims against Southside Hospital, summary judgment dismissing the Complaint as against Southside Hospital is appropriate.

Moreover, it warrants noting that, in light of the Court's previous holdings, the only remaining claim against any of the Hospital Defendants is the Tenth Cause of Action for libel as against Gonzalez. Thus, the potential vicarious liability that may attach to Defendant NSLIJ is limited to damages resulting from Gonzalez's allegedly defamatory statements.

Also, the Court notes that the Plaintiffs failed to specifically plead a cause of action for *respondeat superior* in their Complaint. Nevertheless, New York courts have considered the merits of a vicarious liability claim even where such a theory is absent from the operative pleading. See Saffar v. Albany Med. Ctr. Hosp., 2012 NY Slip Op 30489(U), 2012 N.Y. Misc. LEXIS 917, at *8 (Sup. Ct. Albany Cty. Mar. 2, 2012) ("Although the plaintiff did not specifically plead a claim based upon *respondeat superior*, the plaintiff has demonstrated an actionable claim and summary judgment must be denied") (citing Ramos v. Jake Realty Co., 21 A.D.3d 744, 745-46, 801 N.Y.S.2d 566 (1st Dep't 2005) (deeming the complaint amended to assert a claim for vicarious liability where facts in the record raised issues of fact as to employer's responsibility for employee's torts); Alvord & Swift v. Muller Constr. Co., 46 N.Y.2d 276, 413 N.Y.S.2d 309 (1978)); Rodriguez v. New York City Tr. Auth., 33 Misc. 3d 1206(A), 938 N.Y.S.2d 229 (Sup. Ct. N.Y. Cty. Oct. 6, 2011) (finding "without merit" the argument that an amended complaint which failed to raise *respondeat superior* precludes recovery under that theory).

Finding the Plaintiffs to have demonstrated an actionable claim for vicarious liability against Defendant NSLIJ, the Court, in its discretion, will consider the Plaintiffs' *respondeat superior* theory of liability against Defendant NSLIJ, and deems the Complaint amended to assert such a claim.

Under New York law, "[a]n employer cannot be held vicariously liable for the acts of its employees unless those acts were committed while the employees were performing their duties for the express benefit of the employer." EEOC v. Die Fliedermaus, L.L.C., 77 F. Supp. 2d 460, 473 (S.D.N.Y. 1999) (citing Ross v. Mitsui Fudosan, Inc., 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998)). Whether an employee's act was performed within the scope of his employment "is heavily dependent on factual considerations, and therefore the question is ordinarily one for the jury." Id. (citing Riviello v. Waldron, 47 N.Y.2d 297, 302, 418, N.Y.S.2d 300 (1979)).

*Rodriguez v. New York City Transit Authority*, 33 Misc. 3d 1206(A), 938 N.Y.S.2d 229 (Sup. Ct. N.Y. Cty. Oct. 6, 2011), is instructive. There, the plaintiff had been riding on a subway car when he observed a large man physically threatening a woman. He alerted the conductor to what was happening, but the conductor allegedly did not respond adequately. Eventually, the conductor contacted the police and allegedly falsely notified them that the plaintiff had assaulted him. Although the plaintiff denied any such conduct, the conductor's statement to police formed the basis for the plaintiff's arrest and prosecution.

In an action to recover for damages associated with these events, the plaintiff contended that he had a valid claim sounding in vicarious liability against the

conductor's employer, the New York City Transit Authority ("NYCTA"), because the incident occurred while the conductor was on duty. The NYCTA contended, as the Hospital Defendants do here, that the conductor's false report of an on-the-job injury would not advance the employer's interests and that the conductor had no obligations as an NYCTA employee to speak to the police. Indeed, here, the Hospital Defendants contend that any statements Gonzalez made to the police on March 23, 2012, were in his capacity as a citizen, not an employee, and that his doing so did not further NSLIJ's interests.

The court in *Rodriguez* rejected such reasoning, holding that it could not conclude as a matter of law that the conductor's "actions in speaking to police officers were not reasonably said to be necessary or incidental to his employment as a train conductor." So, too, is the case here as to Gonzalez. As a security officer, and on the day in question a security supervisor, Gonzalez was given the task of maintaining order and responding to disturbances in the Hospital. See Gonzalez Dep. T. at 15-16 (testifying that his duties include responding to calls when there is a problem). In this capacity, he responded to a disturbance call in the Hospital's emergency department arising from the incidents that form the basis of this action. Indeed, there can be no legitimate dispute that the SCPD sought Gonzalez's statement not, as the Hospital Defendants contend, because he happened to be in the vicinity of the incident as a citizen, but because he was the Hospital's security supervisor that day. Whether he granted Tomas and Ian entrance into the Hospital was germane to whether they had criminally trespassed.

38

Moreover, as discussed above, there exists genuine questions of fact as to the truthfulness and defamatory character of the statements Gonzalez gave to the police in his capacity as a Hospital security officer. As a result, to the extent the Plaintiffs can establish direct liability against Gonzalez for defamation, they may also be able to establish derivative liability for such conduct as against his employer.

Accordingly, the motion of the Hospital Defendant NSLIJ for summary judgment, to the extent it seeks to dismiss the Plaintiffs' claims as against it, is denied.

## IV. Conclusion

For the reasons set forth in this decision, the Court grants in part and denies in part the Hospital Defendants' motion for summary judgment.

The Court grants the motion and dismisses: (i) the Tenth Cause of Action for common law defamation as against Defendant Benavides; (ii) the Twelfth Cause of Action for common law negligence as against all Hospital Defendants, finding that claim impermissibly duplicative of the Plaintiffs' defamation cause of action; (iii) the Thirteenth and Fourteenth Causes of Action for civil conspiracy and falsification of documents, respectively, as against all Hospital Defendants, finding those claims abandoned; and (iv) all Causes of Action as against Defendant Southside Hospital.

The Court denies the motion to the extent it seeks to dismiss the Tenth Cause of Action for common law defamation as against Defendant Gonzalez, and to the extent it seeks to dismiss all claims as against Defendant NSLIJ.

In this regard, the Court exercises its discretion to consider the Plaintiffs' theory of vicarious liability against Defendant NSLIJ and deems the Complaint amended to assert such a claim. However, in light of the Court's rulings, the potential vicarious liability that may attach to NSLIJ is limited to damages resulting from Gonzalez's allegedly defamatory statements.

**SO ORDERED**

Dated: Central Islip, New York  
July 21, 2015

*/s/ Arthur D. Spatt*  
ARTHUR D. SPATT  
United States District Judge